Dick Herman for the family of Mr. Cruz, whose mother, Mrs. Smith, is present in the courtroom. Your Honors, this case requires reversal simply on Hayes v. County of San Diego, and I've submitted a letter brief. And on page 28 of the excerpts of records, the court in its opinion said, the court's conclusion that defendants are entitled to summary judgment on plaintiff's 1983 claim compels the conclusion that they are also entitled to summary judgment on the wrongful death claim. And that this isn't true anymore. It probably wasn't true then, but now we have Hayes. And I have a better cite for Hayes. The advance sheets have come out. So the Hayes at 57 Calforth 622, and at page 639, the California Supreme Court, in responding to the Ninth Circuit's inquiry of what the law is, says, state negligence law is, I'm skipping, is broader than Federal Fourth Amendment law. State and Federal standards are not the same, which we now confirm. And what they say is, you have to look at all the circumstances, you have to look at everything. I would, and that obviously wasn't done in this case, and that compels reversal. I would posit that this is the case for the Ninth Circuit to say that Fourth Amendment law has to consider all of the circumstances in an excessive force case. That having seen what the State has done, that this makes sense to this Court as well. I'll ask you first, is this an argument you've made in your briefs to us, in your opening brief, for example? Do you argue that the State claim should be treated separately from the Federal claim? Yes. Where is that? No, I think I argued facts all the way, Judge. I think you're correct. What does that mean? I mean, I think I argued the facts of this case, that the judge was wrong in the analysis. You didn't argue that we should treat State law differently. No. Then why should we take up your argument now? Because the law has changed. This wasn't the law then. No, you didn't argue it to us. You could have argued it to us, but you didn't. I — well, Hayes was decided August 19th of 2013. I filed a letter brief a couple weeks ago, and I laid out Hayes. You're arguing to the district court this issue. Right. Did you argue to the district court that State law should be analyzed separately from Federal law because State law was different? Did I argue? Yeah. Or you just told me, yeah, for us, and then you said no. So if you don't have an authoritative answer, I'll go look. I don't have an authoritative answer. What I do know is that there were four — there was a Fourth Amendment claim, a Fourteenth Amendment claim, and a State law claim, a State law wrongful death claim, and I argued all of those at all times to everyone. In this appeal, I argued that the judge decided wrong on the facts. That's what I said. That's a different argument. That's a different argument. That's right. That's a different argument. But that doesn't mean I can't argue Hayes T. now since it's new law. Why not? Because it's new. Ordinarily, arguments not made in the opening brief are waived. Sure, but it wasn't the law then. That's not my problem. Now is it? You could have argued that it should be the law. This case didn't come out of the blue. Presumably Mr. Hayes was arguing that it should be the law. But you didn't. So why should we reach out and take up that issue? There may be a reason, but I'm waiting to hear from you what the reasons are. Sure. Your Honor, I'm not a mind reader. And this issue has come up in other cases. And the Federal courts have. And you could have asserted it here, but you didn't. So why should we pick up, reach out, and fix the fact that you didn't decide to argue it in this case? Because that's what justice demands, Your Honor. Why doesn't justice demand for us to limit ourselves to the issues raised in district court and in the new brief on appeal? Why isn't that what justice demands? That's not what justice demands because the law has changed, one. And I'm not a mind reader. I didn't know what the courts were going to decide. There are many issues which are not decided. And I wouldn't burden the court with all of the other issues because I argue now that because of Hayes, you have to look. You should also look at the Federal case. It may be too late, but why don't you go ahead and talk about your Fourth Amendment argument? I think we understand your position on this. Your Honor, I ask you to step up to the plate on this case, and I ask you to step up to the plate on all of these cases. This is not a pep talk. We're here to discuss the case. We don't need a pep talk. Why don't you talk about the facts? Why don't you talk about the record and talk about the district court's decision, which is what we're reviewing? Thank you, Your Honor. The district court, at page five of the excerpts, gives the factual background. And the factual background they give is, on December 11, 2009, a confidential informant advised Anaheim police officer Stauber that Cesar Cruz was a member of the Atwood gang who was selling methamphetamine, was armed with a 9mm handgun that he kept concealed in his waistband, and that Cruz believed he was wanted in connection with a recent crime that occurred in Fullerton, that Cruz had previously been involved in a shooting on a freeway, that Cruz was possibly on parole. Is any of that contradicted? Every one of those statements is false. Is there any evidence to contradict any of those factual allegations? Yes, every one of those statements is false, Judge. Every one of those statements is false. I didn't ask whether it was false. I didn't ask whether it was false. I asked whether it was contradicted. Sure. We can't tell whether something is true or false. We don't have a false meter. All we can tell is whether there is evidence on both sides. If there's evidence on both sides, then we send it to the jury. The fact that you believe something is false doesn't help us at all. So did you hear my question? I heard your question. Is it contradicted? Yes. Which of those things are contradicted? Okay, let's start with there was a confidential informant. Is that contradicted? That's true. Okay, not contradicted, okay? The confidential informant informed that Mr. Cruz, the decedent, was carrying a weapon in his waistband. Not true. Not true. What's the contrary? Contradicted. You know, true and not true doesn't help. Contradicted. Contradiction, when he's shot and killed, there's no gun in his waistband. No, no, no, no. That's the question that the chief judge was asking was, is there any evidence that says that that is not what the informant told the police officer? That's a significant issue in this case. What's the contrary evidence? The contrary evidence is the testimony that Mr. Cruz was on his way to pick up his children So that it doesn't make any sense that he was armed with a gun. No, no, no. I think you're misunderstanding the question. The immediate question is, is it correct? Is there any evidence that the informant did not say what he is alleged to have said to the police officers about Mr. Cruz having a weapon in his waistband? Not whether Mr. Cruz had a weapon in his waistband, but whether that was what the informant told the police. One of the issues I did raise in my brief was that we were not allowed to depose the confidential informant. So we only have the testimony of the police officer that says, this is what I was told. So to the extent that that's the only evidence as to what the confidential informant said, and that we were not able to depose the confidential informant, we don't know what happened. We weren't participants in that conversation. There were only two people. Was there any evidence that, for example, inconsistent statements between the police on that issue as to what they were told? There was only Stauber, and his deposition said exactly that. All right. Okay. So it sounds to me like the answer to my question is that statement of the informant was not contradicted. Now, you have an issue as to whether or not you should have been able to identify and perhaps depose the informant. But that's a separate issue. But on the question of whether this is contradicted, on this record, it's not contradicted. It's not contradicted that... That's what the informant said. ...that this was what the informant said. That all of these things are false is inevitable. So barring this issue that we will discuss, you know, if you don't sort of drag things out too long, about whether you should have had access to the informant, we have five police officers who, without contradiction, are informed that this guy is armed and dangerous, that he said, I'm not going back to the slammer, suggesting that he will sooner shoot it out than be taken alive, and that he's got a 9-millimeter weapon and gun in his waistband and ready to use it. So given that information, the uncontradicted information that was given to the... And you don't dispute that this was all known by the five policemen, the officers? No, that this was disseminated, yes. And then we have evidence that he reached, uncontradicted again from the officers, that he reached for his waistband. Well... In the general direction of his waistband. If I can hold that question for just a second, Judge. You have to understand, and you do understand, because you've all been sitting on a bench long enough, that when police officers, this group of police officers who were the special task force unit, when they say there is an armed Hispanic gang member who has said he won't go back to prison, i.e. that he'll shoot it out with the police, that that's a death sentence. That's a death sentence. That's an extrajudicial death sentence. It has to stop. And when, in this case, there was evidence that one of the shooters, Lynn, goes and shoots another unarmed person, in the back this time, who was a Hispanic, alleged a Hispanic gang member, wasn't going to go back to prison, who was armed... You withdrew any allegation as to that, I thought. That's really not before us, is it? It is before us. I asked. Sure, I gave most of my briefest talks about the fact that I wasn't allowed to amend it. Well, I understand, but the answer is you withdrew it. You withdrew it in district court, so you never had gotten district court's ruling on it. Ah. Well, Judge, there is no ruling, but... You withdrew it. Absolutely. At page 303 of the excerpts, there is a note of a telephone conversation about the motion to amend, and the judge said, withdraw it. The judge said, withdraw it. And I withdrew it. So the judge didn't deny it. The judge didn't deny it. The judge had me withdraw it. You know, I heard the judge. I did what the judge told me to do. Does that not preserve the issue? Have I not preserved the issue because I did what the judge told me to do? Because instead of a formal ruling, there was a telephone conference and the judge told me to withdraw it? It sounds like it to me. No, it sounds like an issue to me. You could have said, no, I stand on my issue and I ask for court's ruling. I understand what's... Why? Why? Because... Why? Because... Well, if I were to tell you right now, sit down and withdraw your appeal, would you do that? No, Your Honor. Well, there we go. There we go. So I understand it. I guess you thought you had to do it because you're by nature a timid, shy person who had no choice but to follow the direction of this intimidating judicial officer. You've never disagreed with a judge in your life. You always do exactly what they tell you to do, sacrificing your client's rights in the process. Is that what you're saying? If you haven't dealt with Judge Morrow, she can be quite intimidating. Okay. I withdraw the comment. Yes. I'm really... I mean, we're sort of jesting about it, but I'm really interested in the issue. I mean, when the judge says withdraw it, I mean, sometimes judges will say that to give you a chance of a graceful way out, but I've never known a lawyer to withdraw it when he thought, no, I'm right and I would like to have the issue decided. Well, I was told that it wouldn't be granted. I was told that it's an entirely separate case. If you read in the opinion, the judge says, in the opinion granting summary judgment in this case, the judge says that's all entirely different. We don't care that yet another person in the same set of circumstances, although there are only five cars and a helicopter, in the Rea case there were seven police cars in this case. Is this telephone conference in the record where the judge said withdraw it? That's interesting. I don't know if it was recorded. It's not in the record. It's in the record that there was a telephone conference. Yeah, it's at page 303 of the record that there's a telephone conference. No, but this exchange where you say the judge said withdraw it and you go ahead and do what the judge said, it's taken me a little by surprise, but I don't remember seeing anything in the record. But, you know, it's a big record and I may have missed it. I'm never entirely sure whether telephone conferences are reported. Is a court reporter that listens in? I don't know. I think judges differ on that. I don't know whether this was recorded or not, but it's in the docket. It's in the docket in R. It may have been in the docket that there was a conversation, but unless you have a report, unless you have a transcript, we don't know. And then we get into a swearing contest as to what was actually said. Does a minute order reflect that the court asked that the motion be withdrawn? I don't know if there was a minute order, but at 303. 303 is a docket entry? Page 303. Of what? Of the excerpts. Okay. Item 62. Oh, there is a minute. There's a minute. 303. No, no, no. Yeah. There is, there must be a minute, which is in the record. 12-20-2011. I'm sorry. Which page is the minute? Page 303 of the excerpts. Okay. I'm with you. That's the docket, right? And which docket entry is it? Which number docket? 62. 62. Minutes of telephone conference held before Judge Margaret M. Murrow. Telephone status conference is held in council at present. The court and council discuss the pending motion to amend. Court report are not available. R.A. entered. So that's all there is. No, there will be a minute order that says, as a result, I withdrew. But I was told to withdraw because it was going to be denied. Well, there isn't a minute order that attributes to or grants your request to withdraw, and that's what it says. I've seen that. I could find it again, I suspect. This is 66, right? Minutes in chamber's order by Judge Margaret M. Murrow, withdrawing 57. Motion to leave the file. Right. But it doesn't say that this was done at the judge's request. We have your assertion here today. That's not in the record. Let's see. So on the 20th we discuss it. And on the 22nd. It wouldn't matter in any event, would it? Withdrawal under plain, ordinary English means you are no longer pursuing that particular claim, right, position, whatever it is, as opposed to it having been denied, dismissed, or something like that. That's what withdrawal means. Okay. I get that part. The question is, what happens with this case? In this case. I mean, we do have what happens with this case, but we can no longer consider your argument that, oh, one of the officers does the same thing in another case. That no longer becomes part of the.  We submitted in opposition to summary judgment this evidence. The evidence that one of the defendants had shot someone else and that the justification, the alleged justification was basically the same. Armed Hispanic gang member who said he won't go back to prison. Once, and the point is, once the police say, look what we have here, this is a death warrant. This is a death warrant. It's an extrajudicial death warrant and they go out and shoot people. They did it not just in this case, but one of the same defendants did it in another case, which was before the court, was argued in our opposition to summary judgment. We said, look, this is what happens. You know, that's a pretty serious allegation. I mean, you know, we're here to decide serious cases, but you need to come up with evidence. And, you know, you're telling us it's a death warrant, but this is really sort of a jury argument. There's no evidence of that. There's no evidence of any kind of pattern like this or that, you know, there's one other case where somebody got shot under somewhat similar circumstances. I mean, you've got some evidence of that, but that doesn't really support any finding that this is how they operate. I think the two deaths in remarkably similar circumstances shown to a jury, and, you know, we can argue the Raya case to the jury. We can argue those Raya facts to the jury in this case, and I'll give a cite for there. It's an old case of mine, an old Ninth Circuit case of mine. You can, you know, the conduct afterwards by the same individuals can be used as evidence. So it's not. You're way over your time. Why don't we hear from the defense? Thank you. May it please the Court? I am Greg M. Audet, Deputy City Attorney with the City of Anaheim. Good morning. At the risk of pursuing something briefly that's perhaps not at issue any longer, the Court's minute order reflecting withdrawal of the motion to amend the complaint is in the supplemental excerpts of record at page 1. It's only two sentences long. The Court grants the plaintiff's oral request to withdraw the motion for leave to file a third amended complaint. The January 23, 2012, hearing is hereby vacated. That was in the hearing on the motion to amend. Now, so they withdraw motion to file a third amended complaint, but Mr. Herman tells us that the facts are still in the case. Correct, Your Honor. Plaintiff was not prevented in this case from presenting whatever evidence plaintiff chose to submit in opposition to the summary judgment motion pertaining to the David Raich. Including the fact that one of the officers was within weeks involved in a.  And the reason that the court of the district court analyzed that argument as it analyzed all of the issues in this case quite extensively in its order granting summary judgment and what the court concluded was that there wasn't any evidence in the record establishing that either shooting was unconstitutional or improper. It is insufficient what the court concluded. It's insufficient simply to point to two shooting incidents involving the same officer and without more say that either is true. Two sort of issues here. One of them has to do with the access to the confidential informant. So much of the defense case, much of what is, I mean, first of all, for better or for worse, the only witness on the other side has been killed by the defendants. He can't testify. Yes. And we've been alerted, reminded recently of the fact that in circumstances like that, we really ought to be very careful, because all the surviving witnesses have an interest on the same side, right? And so a lot of it hinges on whether or not they, in fact, got this information from the informant and whether the informant was, should have been considered guilty. Why shouldn't plaintiff's counsel have at least limited access to the informant and try to shake that story a little bit and try to probe it and try to see whether or not, you know, with proper controls and mindful of the need to, you know, avoid retaliation and the like? Two points in response to that, Your Honor. First of all, the district court... I always get nervous when there are two points. Well, I... It makes me think that neither point is really going to get you there. Well... You know, it's like, oh, well, you know, you're not going to be persuaded by one point, but two points, if you sort of add them up. Well, first, and this has to do with the phrasing of the Court's question, why should plaintiff not have been permitted limited access? Plaintiff never asked for limited access, and plaintiff was never denied limited access. Plaintiff asked for... I'm sorry, and defendant would not deny limited access? I think you said plaintiff... Had plaintiff asked for limited access, meaning access to information about the confidential informant that would have still concealed the informant's identity to prevent retaliation, we would not have opposed that, but plaintiff never pursued that. Nor did the court, nor did the district court order... It wasn't covered by discovery otherwise? You know, the... The discovery that the plaintiff propounded regarding the confidential informant was show up for a live deposition and some written discovery saying tell us everything about the confidential informant, names, contact information. So why wouldn't this have been a subset of that? Why wouldn't the thing that you're now saying you would have been willing to offer been a partial response to tell us everything about the informant, saying, well, we can't tell you everything, but here is what we're willing to tell you, all the things that you're now saying you would be willing to say if only the right question had been asked? We answered the questions that were posed, except for the ones that sought identification of the confidential informant. We sought a protective order that only barred disclosure of identity. It did not bar all discovery concerning the confidential informant. The court's order that's in the record is clear. It bars, it grants our protective order, thereby barring discovery that reveals the confidential informant's identity. Right. So in answering the discovery request, you're saying you had all this information you were willing to provide. Why didn't you actually provide it in response to the request that you did get? The only information that was asked for, Your Honor, well, there was a deposition notice to show up for a live deposition, and then there was a series of written discovery inquiries, all of which would have revealed the confidential informant's identity. The case law in this area concerns that. Well, if they say tell us everything, and you say, look, we can't tell you everything, we're not going to reveal your identity, but here's all the things we can tell you about the informant. There was nothing within the purview of the discovery request. You told us what it said. You just stood here. I mean, I haven't gone back and looked at it. You said tell us everything about the informant. Okay. So why couldn't you say, look, we're not going to tell you the identity of the informant. We're not going to tell you his date of birth. We're not going to tell you his Social Security number. We're not going to tell you his sex or age. But here are the things in response to your very broad questions that we can answer. Why wouldn't you tell the – you accorded the questions, so I'm, you know. Your Honor, what we revealed about the confidential informant is what's already in the record and already before the court, which is the specific things that the confidential informant conveyed to a police officer, to Officer Stauber. So there isn't more information that you're saying you have and you would have revealed if only you had asked the right question. I don't think it's a matter of additional information, Your Honor. I think that additional stuff – No, no, that's the question I'm asking. We can – you can answer a different question when you get asked that question, but why don't you answer the question I'm asking? My answer is yes. Yes to the negative. There is not additional factual information. So we've just run around a big circle, a big circle. So basically there was nothing else you could reveal or would reveal. So the question is why shouldn't they get quite a bit more information about this informant? It doesn't have a real identity. I mean, are there cases, you know, how he came to have this information? There's all sorts of stuff that would allow plaintiffs some access to test the veracity of the informant, right? Correct, but plaintiffs made no attempts to obtain that information. All right, so let us – assuming arguendo that this case were sent back to the district court, what kind of deposition would you agree to? I think it would have been appropriate in this case, once again, had plaintiffs asked for this. I understand that point. To simply ask to have the district judge or magistrate judge interview the confidential informant in a way that does not disclose that person's identity to establish whether that person would testify that they conveyed the information to the officers that the officers alleged was conveyed. It could also perhaps be done by written deposition questions that don't inquire, again, into the informant's identity. But I think if this happens in the criminal context, we're – Well, why is this the kind of thing where, you know, if that's what you're willing to do, why is that what you offer up? Let's say you've asked for what you asked for. It's too broad. We're not willing to do that, but we are willing to have the informant questioned by the magistrate judge or district judge. We are willing to have limited questions and so on. And why isn't that part of your responsibility in being forthright in your answers to discovery? Because plaintiffs made a strategic decision in this case that what they wanted was the identity of the informant. They repeatedly asked for that, and they didn't seek any other procedure. And I don't think it was incumbent upon the defense in this case to offer something, an alternative means, when, in fact, we never sought to bar that alternative means. We only sought a protective order to protect the identity. And whatever avenues – whatever avenues – other avenues were available to the plaintiffs in this case, they could have taken. And they adamantly – It's actually a bit of gamesmanship, you know, which doesn't speak well. It's actually a little bit of sort of hiding the ball, which doesn't speak well, and sort of causes at least me to think maybe this case ought to go back, and we ought to now do some of these things that counsel is now willing to do in retrospect. Maybe we should just send it back and have a little more exploration, try some of these things. Tell us a little more what you're willing to do. Let's hear some more. Well, Your Honor, the district court made a ruling, and that is subject to clearly erroneous review at this stage. I think abuse of discretion is – there's no clear – there's nothing clearly erroneous review except findings of fact. And we have no findings of fact because it's a summary judgment. So whatever record is – whatever record – whatever standard of review is applicable in this case, clearly erroneous is not it. That's the one thing that's not applicable in this case. The district court's ruling was the affirmance of a magistrate's ruling granting the protective order, Your Honor. I apologize if I'm in error. That's a clearly erroneous standard, but that's – we did cite case law to that effect in our brief. Clearly, erroneous applies to facts, factual findings, not to exercise of discretion. Now, abuse of discretion is a pretty daunting standard in itself, so I don't know why you're not relying on that. But that – What the court concluded, the standard it applied from the Supreme Court's Roviaro decision was whether the CIA's testimony, the confidential informant's testimony in this case, would be essential to a fair determination of the issues. And the district court looked at the fact that the confidential informant did not observe any of the critical incidents during the shooting in this case. But isn't the gist of what happened, according to your clients, is that because of that information received from the informant, they were on notice that he might have a gun in his waistband, or a notice that he had a motive to try to shoot it out, and therefore they were more quick than they otherwise would have been when they saw him, they thought, reaching for his waistband to fire. So if, for example, the informant says, were to say in one of those limited depositions that you just mentioned, I don't remember saying that at all. Or I told them that he had a gun, I didn't say anything about a waistband. Or, you know, you can hypothesize numerous possibilities. Or I didn't say anything about him saying I'll never go back to jail. That would make a material difference, would it not? It could, Your Honor, but it's important to recognize that the information provided by the confidential informant, just the bare information, was not the exclusive information available to the officers. There were several things. One, much of the information provided by the confidential informant to Officer Stauber was independently verified before these events take place in the parking lot. The gun? The waistband? The threat that I will not go back to prison? No, Your Honor. None of those three were verified? The fact that he was a parolee. None of those were verified? None of the things the court just listed correct. Okay. The fact that he was a parolee with a prior conviction for a shooting was independently verified. I am willing to bet that there are a lot of those. Yes. It also vouches for the credibility of the officers in this case that the information conveyed by the confidential informant was conveyed to the other officers by Officer Stauber in an e-mail that preceded the incident. And that disposes of an argument that this was a, after the fact, justification for what occurred in the parking lot. Those officers were advised to be right. Well, I think the theory is that they planted the gun, they coordinated their story, and they planted the gun. That's their theory. I don't know how good it is, but it's their theory, right? They sent this thing out. They had a story. You know, let's talk a little bit about the actual shooting. I have a, you know, it all sort of hung together for me until I got to the part of the record where they had to cut him out of his seat belt to get him out of the car. How in God's name do five officers able to see, you know, sort of the vehicle door open? You can't really see a guy's belt very well, because the driver is facing forward. You can't look at it from in front because you've got sort of the vehicle door blocking. How could five officers see what he's doing or where his belt is? And what kind of threat does he pose when he is still strapped inside of the car, in his seat belt? I mean, it doesn't somehow hang together for me anymore. To be clear, Your Honor, the record does not reflect that he was still strapped inside his car. The testimony of the five officers. They had to cut the seat belt? They did need to cut the seat belt. They just did it for sport? No, Your Honor. When he fell, he was suspended by the seat belt, but the testimony is. . . Can you climb out of the car with the seat belt still attached? That's what the record establishes happened in this case, and there's nothing to the contrary in the record. Somehow he got out of the car. I want to focus on that element. The Chief Judge alluded to our case law with regard to what happens when the victim is dead, and so we're supposed to scrutinize the circumstances to see if there's an inconsistency. And the pieces I want you to speak to, I made my mind up this one way or the other, but it gave me some pause. One was the seat belt and the notion that he had climbed out of the car enough to appear threatening to the other officers while he's still attached to a seat belt. The other piece, he's supposed to have reached to his waistband. No gun was found at the waistband, so it's not clear to me why someone would be reaching to a waistband if he didn't have a gun there. There's no indication the gun fell out. The gun that was ultimately found was found back in the car. And here I'm just giving you the argument that's been outlined by plaintiff. Apparently he's left-handed, but the testimony was he was reaching with his right hand. Now, why aren't those circumstances that should give us pause in this context where the victim is dead and can't speak for himself to say, well, maybe the story being told by the officers isn't the way it actually happened, and there's enough there to justify permitting a jury to decide? I'll deal with each. I think there's three issues there, Your Honor. With regard to the left-handed, the officer that was closest and that was Officer Phillips, who was closest to the decedent and had a better view of his left side, said that he pulled his shirt up, began to pull his shirt up with his left hand while the right hand reached. The officers that were sort of on the other side of the scene talked about the right hand going down. None of those are inconsistent. The officers were in different perspectives and had different views, some of which were partial. Some of them had x-ray vision. They could see through the door of the car. I'm having a hard time visualizing this, how five officers, I mean, he's getting out of the car. He's still far enough into the car so he has a seat belt strapped to him sufficiently securely that it has to be cut away once he drops dead. And five officers get different views. How do you do that? Was it a glass car? Was the car made of plastic? In the area where he stepped out, Your Honor, the door obviously has a window there. I mean, from the torso up, he's largely visible from the officers that are arrayed in more or less the same way. And how do you do that and still have a seat belt sufficiently connected to you that they have to cut it off when you drop dead? I'm not seeing it. I can't speculate as to what happened with the seat belt, Your Honor, but what the record establishes is that not only the officers but an independent witness saw him get out of the vehicle and his feet hit the ground. There's nothing in the record to contradict that Cesar Cruz got out of the vehicle and both feet hit the ground. Now, how that happens and after the shooting he is suspended in the seat belt, that's some sort of technical issue with the vehicle, I suppose. I'm sorry. You say the five officers and a witness testified and there's no evidence on the other side. Why isn't the fact that he's still strapped in a seat belt a fact on the other side? It's not a fact that involves a witness testifying because, you know, the guy's dead, killed by your clients. But that's still a fact. You can't just sort of say, well, we ignore that and somehow there must be an explanation for it. How about the explanation is that officers are lying and the witness is mistaken? How is that for a way to explain that inconsistency? We don't have to make up stories or suppositions about, oh, how he possibly could have gotten out, had this technical thing where he's strapped into a seat belt so they have to cut him free even though he was standing outside and visible. If I may, Your Honor, not to quibble with the phrasing, but strapped in the seat belt implies to me sort of the position that a person is in in a vehicle. The evidence in this case is that after the shooting, he was hung up. I didn't mean to imply anything. The fact of the matter is he is strapped in a seat belt. Somehow the seat belt is sufficiently attached to his body that they can't get his body out of it without cutting the seat belt. I don't know. To me, that sounds like strapped. If you want to quibble with the word strapped, locked in, what would be a comfortable phrase for you so you won't quibble? Well, strapped implies to me that the seat belt is secure. No, no, no. You give me the term. You give me, you know, I use the wrong term. You quibble with it. Give me a term that works for you. He was caught. Part of him was caught. Okay, caught in the seat belt. So how do you explain this, that he's still caught in the seat belt sufficiently that he has to be cut out of it, even though all these witnesses say he was out of the car? Why isn't one possible explanation? The explanation a juror might buy is the five officers are lying through their teeth and the eyewitness was mistaken. How long was it between the time the eyewitness saw the event and the time when he gave the testimony you were just referring to about he saw him get out of the car? It would have been between the, I mean, the excerpts of the deposition testimony and the record, Your Honor, I don't remember when he was deposed. It would have been, I don't want to speculate. It would have been a period of less than a couple of years, but probably more than a year. A long time, a long time. So the memory would not necessarily have been that sharp. And how far away was he from the vehicle when he saw this? Fifteen feet, Your Honor. And the, I mean, there's a lot of, and I don't wish to imply that this was part of the record, but there's a great deal of neuroscientific evidence that suggests that memory of those kinds of details fades very quickly, fades within 24 hours. The record reflects that the witness was unequivocal, Your Honor. That doesn't mean anything. Witnesses are always unequivocal. Eyewitnesses are classically unequivocal when they identify the wrong man. Well, there are several potential explanations for how a person might get caught up in their seat belt after a shooting like this, and I would concede that it is possible to think of an explanation that is inconsistent with the officer's description of the event. Why isn't that the end of summary judgment right there? Because that is, when balanced against the unrebutted testimony of five witnesses and the more plausible explanations of how someone gets caught up like that, that is the mere scintilla of evidence that should not be a summary judgment. Why don't you give me a plausible, one of those, give me the most plausible explanation. Help me see it that way. The most plausible explanation, but I want to be clear here. I'm offering a somewhat conjecture. Oh, no, I'm sorry. As it's reflected in the record. I don't want you to make up things now. As reflected in this record. What the jury might be able to infer from the record would be that. I'm sorry, there are no explanations in the record. There is no explanation in the record. There is no technical or expert explanation of the record in the record. So when you just threw in there are lots of explanations, you just meant there are explanations out there that you are going to, that you secretly know about. No, no, Your Honor. There are. You understand, we reviewed this record. You reviewed this record. And the question is on this record, given the evidence on this record, why couldn't this be something where you take, if you took this and put it in front of a jury where a jury could say no, the five officers were lying, the eyewitness was mistaken. And to us what we find persuasive is that the guy is still strapped, locked, what was he used, still caught, caught by the seatbelt. And we just cannot see how somebody who is sufficiently caught by the seatbelt that he has to be cut away after he is dead could possibly have been a serious threat enough to justify 20 bullets. And you know what we're going to infer is that they planned to shoot him to begin with. And they set the whole thing up to make an execution just like Mr. Herman suggests. Why couldn't the jury come to that conclusion? Because it's inconsistent with what occurred that day. It's inconsistent with what starts as a routine traffic stop and turns into. It was not a routine traffic stop. It was a prestigious traffic stop. It was a drug bust. It was based on, I mean, it is nothing but, it's everything except a routine traffic stop. It was a subterfuge, which may be okay. I'm not saying there was anything wrong with having a subterfuge traffic stop when you've got somebody who's armed and dangerous and so on. But what if the whole thing is a lie? What if they're out to get him, they invent an informant, you'll shake your head. But were you there? No, Your Honor, of course not. So we really have to just base on what's in the record. What is in the record, Your Honor, is after they attempt that initial stop, that Mr. Cruz's behavior is entirely consistent with what the officers have been informed. Say you. Say you. Well. Say the officers. We don't have Mr. Cruz's side of the story. There's no disputed facts on the record about the fact that Mr. Cruz refused the initial traffic stop, drove the officers, led the officers into a parking lot, that when two officers exited their vehicle, he initially feigned compliance and then accelerated down to the end of a row until he was cut off by an unmarked police car. Did the neutral third-party witness see all that? Yes. Well, obviously he didn't see the initial attempt at a traffic stop. No, no, but he saw the. But everything that happens once we're inside the parking lot, the neutral third-party witness sees it. He recalls that the marked patrol car behind Mr. Cruz had its lights and sirens on. Mr. Cruz had to know that these were police trying to pull him over. He stopped and feigned compliance for a few seconds, and then he accelerated rapidly to try and leave the parking lot. When he was cut off, he put his Suburban into reverse until it hit into the marked black and white behind him. Everything that the officers. You know, all of that is fine, and they should have taken the custody, but 20 bullets? 20 bullets? You know, for five officers to a guy who turns out to be unarmed? Your officer. I'm sorry, Your Honor. I don't believe the record reflects 20 bullets. I believe that the court may consider this an inapposite difference, but I believe the record reflects an average of three bullets per officer, and there were five. Oh, I'm sorry. So you're quibbling over 15 versus 20? Well, I don't want to quibble, Your Honor, but I just wanted to point out that in a situation where all five officers saw him reach for his waistband, where they had been told he had a weapon, this is not a situation where the officers fired repeatedly over a long time period. It's unrebutted on the record that all of the shooting here took place over two to three seconds. I'm still having a hard time understanding how, given somebody getting out of the car and the door and the fact the cars are not transparent, how five different officers could have a point of view where they could each see him reaching for anything in his waistband. I'm still having a very hard time figuring that one out. It's consistent. But there it is. The record is what it is. Thank you. Thank you, Your Honor. Mr. Herman, you've more than used up your time. I think we'll leave it as it is. Case is argued. We'll stay a minute. We're adjourned.
judges: Rakoff, Kozinski, Clifton